**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS A. FERENCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 2918 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| AON CONSULTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER AND OPINION

Presently before us is Aon Consulting, Inc.'s ("Defendant") Motion for Summary Judgment. Defendant argues that Thomas A. Ference's ("Ference") claims for employment discrimination fail because they are time-barred and unsupported. For the reasons set forth below, we grant Defendant's motion.

## SUMMARY OF THE FACTS[1]

Ference was born on January 22, 1951. (Pl. Facts ¶ 81). He began working at Aon Consulting ("Aon") when Aon acquired his previous employer, Book & Company, in 1993. (Pl. Facts ¶ 2; Def. Facts ¶ 1). After working for Aon for about a year, Ference was transferred to the Chicago office where he held a managing role as a senior vice president responsible for marketing and ran the regional sales effort. (Pl. Dep. at 17; Richard Anthony ("Anthony") Dep.

---

[1] Unless otherwise noted, the facts described herein are undisputed. We primarily rely on the submitted documentary evidence. In addition both parties argue that the other has violated Local Rule 56.1 by including inadmissible facts, impermissible argument, and inadequate references in their statements of fact. While we acknowledge these objections, for the purposes of this opinion, we have examined the supporting documents and will consider the relevant admissible evidence.

at 16).

In May 1998, Ference was promoted to National Marketing Director for Aon-Consulting-US and Employee Benefits Marketing Director for the Employee Consulting Group (Def. Facts ¶ 7; Donald Ingram ("Ingram") Dep. Ex. 3). At this time, he also became the Chair for the National Marketing Committee. (Pl. Facts ¶ 84).

In 2002, Ingram, Defendant's CEO, asked Ference to cut his budget in half and terminate half of his staff. (Pl. Facts ¶ 85). Ference claims that these budget and staff reductions prevented him from being eligible to become an executive vice president. (*Id.*). Ingram testified that the budget cuts were implemented to reduce expenses. (*See* Ingram Dep. at 75-76; Pl. Dep. at 244).

In either 2003 or 2004, Ference became a team leader for the Strategic Account Sales Facilitation Team ("SASFT"). (Pl. Facts ¶ 83). During this time, Ference also assumed control of the McDonald's account. (*See* Def. Facts ¶ 15; Pl. Resp. Def. Facts ¶ 15). Around this same time in 2004, Ference began reporting to Roger Vaughn ("Vaughn") instead of Ingram. (Ingram Dep. at 65). When the SASFT disbanded in either 2005 or 2006, Ference became a Key Account Manager ("KAM"). (Pl. Facts ¶¶ 83, 86; Def. Facts ¶ 16).

Ference alleges that beginning in September 2005, Aon began discriminating against him on the basis of his age and gender. (Resp. at 1). The first alleged instance was on September 15, 2005, when Roger Vaughn referred to Ference as an "old dog" in an email. (Pl. Facts ¶ 88; *Id.* Ex. P). Other alleged instances of discrimination are discussed below.

## A. Promotions

Ference alleges that he was discriminated on the basis of age because he was not

promoted to be the National Head of KAM. Instead, in 2005, Ingram and Vaughn hired Peter Bridges, previously of Hewitt & Associates, as the National Head of KAM. (Def. Facts ¶ 21; Ingram Dep. at 44). This newly-created position focused on developing a staff of senior account managers to service large corporate clients. (Def. Facts ¶ 21; Ingram Dep. at 44). Defendant claims that it was looking for someone with a "track record and background in penetrating larger clients," "who was going to help us extend our services in to larger companies." (Ingram Dep. at 44-45). The position was not posted and Vaughn and Ingram did not consider anyone else for this position because they created the role for Bridges. (Pl. Dep. at 249-50; Vaughn Dep. at 32). In addition to being the National Head of KAM, Bridges was also responsible for representing Aon on a Global Large Corporate ("GLC") Committee. (Def. Facts ¶ 23). Ference was not approached about either of these positions. (Pl. Resp. Def. Facts ¶ 30).

When Bridges left Aon, Ference alleges that Defendant chose Rick Wellner ("Wellner") as his replacement for the GLC position as a result of age discrimination. (Resp. at 2; Def. Facts ¶¶ 23, 25). Wellner, who was born on February 10, 1955, was 51 at the time he accepted the position. (Def. Resp. Pl. Facts ¶ 93). Ference interviewed for this position, but claims he would not have had the opportunity if he had not filed a complaint after overhearing his supervisor, Andrew Appel ("Appel"), discussing the interview process with his assistant. (Pl. Dep. at 55). In addition, when Ference asked Appel why he was not being considered, Appel replied "What's wrong, Tom? Don't you like working with me." (Pl. Dep. at 55; Def. Facts ¶ 26). Ference interpreted this comment as an age-based threat not to apply for the position. (Pl. Resp. Def. Facts ¶ 26).

In June or July 2005,[2] Cindy Keaveney ("Keaveney"), who had been working at Aon since 1999, was hired to replace Bridges as the National Head of KAM. (Def. Facts ¶ 29; Keaveney Dep. at 12, 19). Ference was not aware of any posting for this position and Keaveney states that she did not submit a formal application. (Pl. Dep. at 249-50; Keaveney Dep. at 19). Around this time, Aon established diversity councils for females. (Pl. Resp. Def. Facts ¶ 27).

In 2006, as National Head of KAM, Keaveney was in charge of hiring Regional KAM leaders and Ference alleges that the selection of these positions involved both age and gender discrimination. (Def. Facts ¶ 34). Peter Russell ("Russell"), who was 45 years old and indirectly reported to Ference, was promoted to Southeast Regional KAM Leader. (Pl. Facts ¶ 99; Def. Resp. Pl. Facts ¶ 99). Katherine Childress ("Childress") was promoted to Northeast Regional Leader. (Pl. Facts ¶ 117; Def. Facts ¶ 35).[3] In July 2006, Jeff Yehle ("Yehle"), born September 9, 1965, was hired as the KAM Regional Leader for Aon's Central West region. (Pl. Facts ¶ 97). In addition, Michelle Futhey ("Futhey") was promoted to the Central West Regional Director. (Pl. Facts ¶ 118).[4] Ference testified that while he was aware that these regional leadership

---

[2] Ference claims that this decision was made in "June or July 2006." (Pl. Facts ¶ 115). However, the record evidence that Ference cites does not support this date. In fact, Ference cites to Keaveney's deposition which indicates that she was hired "in June or July of 2005." (Keaveney Dep. at 12). In addition, Ference does not dispute Defendant's claim that Keaveney was promoted in 2005. (Pl. Resp. Def. Facts ¶ 31).

[3] Defendant claims that Childress and Russell were promoted before May 18, 2006. (Def. Facts ¶ 37). However, we are unable to discern the date of the email that Defendant relies on as evidence of their promotions. (*See* Def. Facts Ex. 13). Therefore, drawing all inferences in favor of Ference, we will assume that these promotion decisions occurred within the statutory limitations period. We also note that even though Childress may have been hired as early as 1988, as Defendant claims, (*see* Def. Resp. Pl. Facts ¶ 117), the date of her promotion is all that is relevant for our present purposes (not the date that she originally started at Aon).

[4] Defendant also disputes that Futhey's promotion occurred in 2006. (*See* Def. Reply at 4). While the exact date of Futhey's promotion is unknown, Ference testified that he first heard

positions were being filled, he never saw them advertised in a job posting. (Pl. Dep. at 250, 256).

Keaveney testified that she did not consider Ference for either the Southwest or Northeast regional positions due to geography. (Keaveney Dep. at 91). In addition, while she did consider Ference for the Central West position, she believed after supervising him over the prior year, that he lacked the necessary client development history and leadership skills. (Keaveney Dep. at 31-32). Another KAM, David Walker ("Walker") testified that he asked Keaveney to be considered for the Central leader position but that he was never interviewed. (Walker Dep. at 47).

Another promotion that Ference alleges involved age discrimination was Greg Martens's ("Martens") promotion to the Chicago Market Leader Position in October 2006. (Def. Facts ¶ 41; Pl. Facts ¶ 100). Prior to this position, Martens (born June 9, 1974) had been a part of one of the teams that Ference was running. (Martens Dep. at 50).

Finally, as late as February 2007,[5] Lurline Craig-Burke was promoted to the Head of the

---

that Futhey was selected to be Central West Regional Director "sometime in '06." (Pl. Dep. at 87). Defendant does not dispute this contention in its response to Ference's statements of facts. (Def. Resp. Pl. Facts ¶ 118). Thus, drawing all inferences in Ference's favor, we will assume that Futhey was promoted in 2006.

[5] The exact date of Craig-Burke's promotion is unclear. Ference claims that she was not appointed to be the head of the industry vertical until February 2007. (*See* Pl. Dep. at 83 (responding to an October 4, 2007 deposition question asking when Craig-Burke was selected or when he learned of her selection, Ference stated "eight months ago, maybe")). Defendant, on the other hand, argues that she was promoted in April 2005. (Def. Facts ¶ 45; Neiderkorn Decl. ¶ 3). Additionally, Keaveney's testimony indicates that Craig-Burke may not have joined the KAM group until sometime in 2006. (Keaveney Dep. at 49 ("She became a key account manager in 2006, and I don't remember the month.")). However, because we must draw all inference in Ference's favor, we will analyze her promotion as if it occurred in February 2007.

Insurance Industry Vertical.[6]  (Pl. Facts ¶ 119).  Ference claims that he was the first person to develop and head the business plan of the insurance industry vertical but, nonetheless, was not considered for this position.  (*Id.*).

## B.  Alleged Barriers to Success

### 1. Performance Metrics

In 2006, management assigned all KAMs specific performance metrics, such as chargeable hours, sales credit, and innovation goals.  (Def. Facts ¶¶ 50, 57, 58; Pl. Facts ¶ 106).  For chargeable hours, the average KAM utilization rate requirement was 35%.  (Keaveney Dep. at 52-53).  Keaveney only assigned Ference a 25% goal, however, because he had not billed hours for quite sometime.  (*Id.*).  Ference discussed with Keaveney that even this 25% goal might be difficult for him to achieve because he was not assigned a book of clients and was not a member of a practice group.  (Def. Facts ¶ 55; Keaveney Dep. at 55; Pl. Resp. Def. Facts ¶¶ 50, 54).[7]  Keaveney discussed other ways that Ference could meet his goals through account management, meeting facilitation, stewardship meetings, peer review work, and other activities serving clients.  (Keaveney Dep. at 55).

---

[6]  Defendant claims that she was a member of the KAM group with a focus on insurance companies.  (Def. Facts ¶ 45; *see also* Keaveney Dep. at 96 ("So we asked her to come in and transfer those skills and successes into an industry orientation within our KAM group.")).  Ference claims, however, that her title was "Head of the Insurance Industry Vertical."  (Pl. Resp. Def. Facts ¶ 45).  For purposes of this opinion, we will adopt Ference's chosen term.

[7]  It is disputed whether or not any KAMs were permitted to join practice groups.  Defendant claims that no full-time KAMs, including Ken Weinberger, Dean Chapman, and Karen Roberts, were members of practice groups.  (Keaveney Dep. at 97-98; Yehle Dep. at 63).  Ference claims that Dana Chapman and Karen Roberts were members of the health and benefits practice group and Ken Weinberger was a member of the merger and acquisition group.  (Pl. Dep. at 114-15, 199).

Ference also claims that he was treated unfairly with respect to the other two performance metrics: sales credit and innovation. While Defendant claims that it applied the sales credit rules consistently across all KAMs (Def. Facts ¶ 52), Ference asserts that he was not properly given credit for a $100,000 sale at Kraft. (Pl. Resp. Def. Facts ¶ 52). However, even if he were given credit for this sale, he would not have achieved his sales credit goals. (Pl. Dep. at 231). In addition, Ference claims that he was not properly given credit for two uncompleted white papers as part of his innovation goal. (Pl. Facts ¶ 113). However, he was advised that he did not receive credit because the papers were incomplete. (Def. Resp. Pl. Facts ¶ 113).

Ference failed to meet his performance goals as reflected in his 2006 performance evaluation. (Pl. Dep. Ex. 10). On April 30, 2007, Ference received a "final warning" in his employment improvement plan setting additional performance goals and indicating that disciplinary action might result if these goals were not met in the future. (Yehle Dep. at 70-71 & Ex. 8).

## 2. Assignment of Accounts

Ference claims that his inability to meet his performance goals was influenced by the way Aon assigned accounts, such that he was set up for failure. (Resp. at 14). For example, Anthony, a former senior vice president at Defendant, testified that Ference was assigned to Sears while the company was in litigation with Aon, and assigned to McDonald's while it had a fractured relationship with Aon due to Vaughn's decision not to rebid for renewal of a contract. (Anthony Dep. at 39).

In addition, Ference alleges that Aon's decision to transfer accounts from Ference to other employees was discriminatory. Specifically, he challenges Defendant's decision to

transfer the McDonald's and Discover accounts to Martens and the Verizon account to Jamie Honigman. (Def. Facts ¶¶ 68, 72, 73). Ference claims that the McDonald's account was transferred only after he had begun to make progress. (Pl. Dep. at 69, 72). However, Hayley and Yehle testified that the account was transferred because the client was dissatisfied with Ference's work as reflected in a negative Client Impact Review and because the client requested to work with Martens. (Hayley Dep. at 75; Yehle Dep. at 49; Def. Facts ¶ 71). Ference claims that the Discover account was transferred to Martens because Discover had hired a new young male HR director and Martens was a young male. (Pl. Dep. at 76). Ference also claims that Verizon was transferred away from him right when it would have increased Aon's business opportunities due to the SBC acquisition. (Pl. Resp. Def. Facts ¶ 72). Defendant claims that all KAMs had accounts transferred to/from them and that all KAMs were assigned to problem accounts. (Def. Facts ¶¶ 65, 67).

### 3. Assignment of Offices

After Yehle and Martens were promoted, they both were given offices. (Keaveney Dep. at 74). Yehle and Keaveney also decided to remove Ference from his office into a cubicle. (*Id.* at 73-74). Keaveney testified that this decision was due to the consolidation of various offices in the building, the fact that Ference frequently worked from his home in Indiana, and because Yehle and Martens needed an office to handle confidential discussions with employees. (*Id.*). Walker, another KAM, also dealt with confidential information, but related to clients not other employees. (Walker Dep. at 64; Def. Resp. Pl. Facts ¶ 114). In addition, Walker testified that Dan Chismandoes had his own office even though he did not have direct reports and was frequently away from his office. (Walker Dep. at 65).

## C. Procedural History

On March 21, 2007, Ference filed a Charge of Discrimination with the EEOC against Aon Consulting. (Def. Facts ¶ 80). The EEOC issued him a Notice of Right to Sue on May 2, 2007. (Compl. ¶ 6). He announced his resignation on August 6, 2007, effective August 20, 2007. (Pl. Facts ¶ 120).

On May 24, 2007, Ference filed a complaint alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq*. (Compl. ¶ 1). He is seeking injunctive relief, declaratory relief, and damages. (*Id.*).

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (internal quotations omitted).

Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving

party's evidence as true and draw all inferences in that party's favor.  *See Anderson*, 477 U.S. at 255.

## ANALYSIS

Aon argues that it is entitled to summary judgment because:  (1) some of Ference's claims are untimely; (2) Ference has not established a *prima facie* case or pretext for age or gender discrimination for his failure to promote claims; and (3) he has not established a *prima facie* case or pretext for his disparate treatment age discrimination claim regarding his KAM goals.  We address these arguments below.

### I.  Statute of Limitations

Aon argues that the majority of Ference's failure to promote claims are time-barred or relate to non-parties to this action.  (Mot. at 7).  Specifically, Aon argues that because Ference filed his EEOC charge on March 21, 2007, any alleged discriminatory acts based on age or sex before May 25, 2006 are not actionable.  (*Id.* at 7).  Ference responds that regardless of whether actions before May 25, 2006 are time-barred, we may consider prior actions as evidence of his timely claims.  (Resp. at 4).

In order to file a timely claim in Illinois, a plaintiff alleging employment discrimination must file an EEOC charge "within 300 days after the 'alleged unlawful employment practice.'" *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)(1)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S. Ct. 2061, 2070 (2002).  Thus, a plaintiff may not bring a failure to promote claim if the action occurred more than 300 days prior to the EEOC filing.  *See Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005).  However, the Seventh Circuit has stated repeatedly that we may

look to events occurring outside the 300-day window "'as background evidence in support of a timely claim.'" *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004) (quoting *Morgan*, 536 U.S. at 113, 122 S. Ct. at 2072); *see also Fischer v. Avande, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) ("[T]ime barred acts [are allowed] as support for a timely claim." (internal quotations omitted)).

In the instant case, Ference's alleged discriminatory promotions that may have occurred before May 25, 2006[8] include: Russell, Childress, and Yehle's promotions to regional KAM leadership positions; Futhey's promotion to Central West Regional Director; Martens's promotion to the Chicago Market Leader Position; and Craig-Burke's promotion to be the Head of the Insurance Practice Vertical. In addition, we will only consider Ference's claims pertaining to events occurring before May 25, 2006 for the limited purpose of background evidence.

## II. Failure to Promote Claims

Ference claims that Defendant's promotion decisions were discriminatory based upon age and gender. "The ADEA prohibits employers from discriminating against employees [over 40 years old] based on [their] age [ ] with respect to . . . privileges of employment. To maintain a[n] ADEA [claim], employees must establish that they would not have suffered adverse treatment 'but for' the employer's motive to discriminate based on . . . age." *Woolner v. Flair Comm. Agency, Inc.*, No. 01 C 6043, 2004 WL 2032717, at *3 (N.D. Ill. Aug. 30, 2004) (internal citations omitted). In addition, Title VII forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

---

[8] As indicated above, we recognize that the parties dispute the precise dates of some of these promotions. Nevertheless, we must draw inferences in Ference's favor for the purposes of summary judgment.

because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff can establish his ADEA and Title VII claims by offering direct proof of discrimination or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973); *see also Delgado v. Bd. of Educ. of City of Chi.*, No. 07 C 1331, 2008 WL 343474, at *5 (N.D. Ill. Feb. 7, 2008). In this case, Ference appears to be proceeding solely under the indirect method.[9]

---

[9] Aon's Motion for Summary Judgment argues that Ference has failed to provide direct evidence of age discrimination. (Mot. at 9). While Ference does not dispute this argument in his response and thus has waived it, we also find that there is insufficient evidence in the record to support a claim of direct discrimination. *See Laborers' Intern. Union of N. Am. v. Caruso*, 197 F. 3d 1195, 1197 (7th Cir. 1999) (explaining that parties waive arguments not presented in response to motions for summary judgment).

"The focus of the direct method of proof . . . [is] whether the evidence 'points directly' to a discriminatory reason for the employer's action," and may be proven by either direct or circumstantial evidence. *Atanus v. Perry*, -- F.3d --, 2008 WL 696908, at *5-6 (7th Cir. Mar. 17, 2008). Proving discrimination using the direct method "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal citations omitted). In addition, discriminatory comments made by an employer are often used to prove direct discrimination. *Sembos v. Phillips Components*, No. 00 C 4651, 2003 WL 1342985, at *4 (N.D. Ill. Mar. 18, 2008) (citing *Mojica v. Gannett*, 7 F.3d 552, 561 (7th Cir. 1993)). To be actionable, a comment must be made by "the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

Upon analyzing the two alleged age-based comments in this case, we find that they are insufficient to establish age discrimination under the direct method. The first comment occurred on September 15, 2005 in an email from Vaughn that referred to Ference as an "old dog." (Pl. Facts ¶ 88). This comment, however, does not qualify as direct evidence of discrimination because it was not tied to any non-time-barred alleged discriminatory decision and was not meant to denigrate him for his age. *See Nowak v. Int'l Truck & Engine Corp.*, 406 F. Supp. 2d 954, 963 (N.D. Ill. 2005) (holding that employer's use reference to "old-timers" was not direct evidence of age discrimination because it was "descriptive rather than evaluative" and did "not denigrate . . . employees for their age"). To the contrary, the comment was used to compliment Ference on his McDonald's call report. (*See* Pl. Facts Ex. P; Vaughn Dep. at 60).

The second comment occurred no later than January 2006, when Ference expressed

Under either method, a plaintiff must demonstrate that his employer's actions amounted to "a materially adverse employment action." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). This is defined as "something 'more disruptive than a mere inconvenience or an alteration of job responsibilities,'" and includes actions such as discharge, denial of a promotion, or a significant change in job responsibilities. *Id.*

*McDonnell Douglas* sets out a three-step analysis to assess unlawful discrimination in the absence of direct proof. 411 U.S. at 802-03. First, the plaintiff must establish a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff fails to meet his or her initial burden, the defendant is entitled to summary judgment. *Oest v. Ill. Dep't of Corrections,* 240 F.3d 605, 612 (7th Cir. 2001). Assuming that the plaintiff satisfies the first step, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant succeeds in so doing, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *Id.* at 804.

## A. *Prima Facie* Case

To establish a *prima facie* case for a failure to promote claim under the ADEA, a plaintiff has to establish by a preponderance of the evidence, that: "(1) he belongs to a protected class, (2) he applied for and was qualified for the position sought, (3) he was rejected for that position,

---

interest in the GLC position and Appel replied, "What's wrong, Tom? Don't you like working with me." (Pl. Dep. at 55; Pl. Facts ¶ 93; Def. Facts ¶ 26). As we explained above, however, Ference's failure to promote claim related to the GLC position is time-barred. In addition, this neutral comment does not amount to "an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes*, 359 F.3d at 504; *see also Gorence*, 242 F.3d at 764 (explaining that even a decision maker's statement that "he didn't want to talk to any middle-aged menopausal women" did not mean that the plaintiff wasn't hired because she was a middle-aged woman). Therefore, Ference has not established an ADEA claim under the direct method.

and (4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003); *see also Fischer*, 519 F.3d at 402. The *prima facie* case necessary to present a Title VII reverse discrimination claim is the same as under the ADEA except for the first prong. *Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003). Instead, under Title VII, a plaintiff must demonstrate "background circumstances that [his employer] had a reason to discriminate against men or that the circumstances are 'fishy.'" *Delgado*, No. 07 C 1331, 2008 WL 343474, at *5; *see also Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). At issue in this case is whether Ference has established the second and fourth prongs of his age discrimination *prima facie* case as well as the first, second, and fourth prongs of his gender discrimination *prima facie* case.

   With respect to the second prong of both his age and gender claims, the parties dispute what is sufficient when an employer does not post information regarding an open position to its employees. The Seventh Circuit instructs that where an employer does not formally post open positions, a plaintiff only needs to show that "had the employer approached her, she would have accepted the offered position." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994); *see also Fischer*, 519 F.3d at 402 n.2.; *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376-77 (7th Cir. 1985). To demonstrate that he would have accepted the position, however, a plaintiff must show more than a "vague interest" in the position. *See Box*, 77 F.2d at 1377. In other words, he must show that he "'explicitly expressed [his] desire' to be hired," which can be established by informal inquiries. *Sembos*, No. 00 C 4651, 2003 WL 1342985, at *5 (quoting *Elguindy v. Commonwealth Edison Co.*, 903 F. Supp. 1260, 1267 (N.D. Ill. 1995)); *see also Joyner v.*

14

*Archer-Daniels-Midland Co.*, 03-CV-2177, 2007 WL 418921, at *21 (C.D. Ill. Feb. 2, 2007) (finding that the plaintiff failed to provide evidence that he would have accepted a position because he failed to express any interest in it).

In the instant case, Ference does not dispute that he failed to express an interest in any of the promotions at issue.[10]  Instead, he claims that Defendant has conceded that he would have accepted these positions if offered.  (*See* Resp. at 7 & n.4 ("Defendant offers no evidence and makes no argument that Plaintiff would not have accepted the respective positions had they been offered.")).  However, as indicated above, in order to prove that he would have accepted the position, Ference needs to come forward with evidence demonstrating more than a "vague interest" in a position.  *Box*, 77 F.2d at 1377.  In addition, Ference is incorrect and Defendant has not conceded this argument.  Defendant's motion explicitly states that "there is no evidence that Ference applied for, or expressed an interest in, the Aon Consulting positions at issue."  (Mot. at 10).  Therefore, Ference has not satisfied his *prima facie* case with respect to the second prong because he has not demonstrated that he showed an interest in any of the positions at issue.

Because we find that Ference has not met the second prong of either his age or reverse gender discrimination claims, we need not reach whether he has satisfied the fourth prong of both claims or the first prong of his reverse gender discrimination claim.[11]

---

[10]  The only position that Ference may have expressed an interest in was the GLC position.  However, as indicated above, Ference's claim related to that position is time-barred.  In addition, the evidence demonstrates that Ference was aware that Defendant was hiring regional KAM leaders, but never expressed an interest in those positions.  (Def. Facts ¶ 35).

[11]  We do note, however, that Ference's only evidence of "fishy" circumstances for his reverse gender discrimination claim appears to be that Aon had established diversity councils for women around the time of Keaveney's promotion to the National Head of KAM.  (Pl. Resp. Def. Facts ¶ 27).  However, not only is this claim time-barred as indicated above, but also "'an

## B. Pretext

Even assuming that Ference successfully presented a *prima facie* case of age discrimination, the evidence does not suggest that Defendant's nondiscriminatory reasons for promoting other individuals are pretextual. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). To prove pretext, "a plaintiff must show (1) the employer's nondiscriminatory reason was dishonest; and (2) the employer's true reason was based on a discriminatory intent." *Fischer*, 519 F.3d at 403 (internal quotations omitted); *see also Brown v. Ill. Dep't of Nat. Res.*, 499 F.3d 675, 683 (7th Cir. 2007).[12] "This can be done with either direct or indirect evidence" and we may consider Ference's time-barred claims as possible evidence. *Fischer*, 519 F.3d at 403-04. In addition, it is the "perception of the decision-maker" that controls the pretext analysis. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337-38 (7th Cir. 1991) (quoting *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989). The "ultimate burden of persuading the trier of face that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Testerman*, 98 F.3d at

---

affirmative action plan alone is not sufficient to prove the modified first element of the prima facie case of reverse-discrimination.'" *Nowak*, 406 F. Supp. 2d at 964 (quoting *Christensen v. Equitable Life Assur. Soc. of U.S.*, 767 F.2d 340, 343 (7th Cir. 1985)).

[12] It is well established that we are not to sit as "super personnel departments to second guess an employer's facially legitimate business decisions." *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1007 (7th Cir. 2002). "'[I]t is incumbent upon us to remember that what is at issue is not the wisdom of an employer's decision, but the genuineness of the employer's motives.'" *Schuster v. Lucent Techs.*, 327 F.3d 569, 575 (7th Cir. 2003) (quoting *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996)); *Hartley,* 124 F.3d at 890 ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless.").

303.

Ference claims that his superior qualifications indicate that the reasons given for

Defendant's hiring decisions are pretextual. "'Evidence of the applicants' competing

qualifications does not constitute evidence of pretext unless those differences are so favorable to

the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the

plaintiff was clearly better qualified for the position.'" *Fischer*, 519 F.3d at 404 (quoting

*Mlynczak v. Bodman*, 442 F.3d 1050, 1059-60 (7th Cir. 2006)). In addition, to establish

qualifications a plaintiff may not rely solely on his self-assessment of his own qualifications.

*Balamut v. Abraham*, 2004 U.S. Dist. LEXIS 21351, at *16 (N.D. Ill. Oct. 20, 2004) (citing

*Dunn v. Nordstrom*, 260 F.3d 778, 787 (7th Cir. 2001)). We address each timely promotional

decision below.

**1. KAM Regional Leader Positions**

Ference argues that Defendant's reasons for not promoting him to the KAM Regional

Leader roles were pretextual because he was more qualified than Yehle, Russell, and Childress

for these positions.[13]

First, with respect to the Northeast KAM Regional Leader position, Defendant claims

---

[13] We acknowledge that Ference argues that Defendant's promotion of Futhey to the Central West Regional Director position was discriminatory based on gender because of his superior qualifications. (Resp. at 11-12). After combing the record, however, we will not proceed to the pretext analysis for this particular promotion because Defendant does not appear to have come forward with a nondiscriminatory reason for hiring Futhey as the Central West Regional Director. *See McDonnell Douglas*, 411 U.S. at 802. Nevertheless, summary judgment is still appropriate with respect to the Central West Regional Director position because Ference has not presented an adequate *prima facie* case of reverse sex discrimination as indicated above.

that it promoted Yehle over Ference because Yehle "had built and developed teams in his prior company experience to drive successful results" and had "significant sales experience." (Keaveney Dep. at 38-40).  Keaveney also testified that she did not choose Ference for the KAM Regional Leader positions because "he was overly verbose, did not have a 'followship' in that he did not have credibility and reputation of being a solid team leader, did not have a proven track record of success in a client facing position, and did not have traction or a history of client development and expansion."  (Mot. at 12-13).

Ference argues he was more qualified for this role because Yehle "possessed substantially less education and experience."  (Resp. at 10).  Specifically, Ference cites to the fact that he had an MBA whereas Yehle did not, he had knowledge of Aon Consulting whereas Yehle was an outsider, and Yehle was not in a sales role at his prior employer.  (Pl. Resp. Def. Facts ¶ 40).  In addition, he provides testimony from Walker indicating that Ference was "regarded very highly" among his peers, and "ha[d] deep knowledge [about] actuarial and pension fund[s]."  (Walker Dep. at 54-55).  Ference also claims that these reasons are pretextual because Keaveney did not sufficiently investigate all of Ference's prior experiences when she selected candidates for the position.  (Resp. at 10).

This evidence, however, "falls short of clearing the high hurdle necessary to establish pretext through reference to [his] own superior qualifications for the position" because Ference has not shown that the selection of Yehle over him was unreasonable given Keaveney's explanations for the promotion.  *Fischer*, 519 F.3d at 404.  We also disagree with Ference's argument that Keaveney's lack of complete knowledge of all of his prior experiences was somehow discriminatory.  While Keaveney did testify that she did not "make any attempt to

determine what Mr. Ference's prior experiences and positions have been at Aon before [she] became employed," she did supervise him for the year prior to her decision and was aware of his experiences in marketing and in the SASFT initiative. (Keaveney Dep. at 32, 41). In addition, there is no indication that her failure to inquire regarding his previous experiences was motivated by age discrimination.

Ference also claims that he was more qualified than Russell for the Southeast Regional KAM Leader position because Russell "had significantly less sales management experience." (Pl. Facts ¶ 99). In addition, Russell had previously indirectly reported to Ference. (Pl. Dep. at 30). Keaveney, however, testified that she chose Russell as a KAM leader because of his "[v]ery, very strong, successful, sequential, exceeding targets, growth and development of clients, year over year over year," as well as his "strong reputation for bringing resource teams into clients and leading those teams." (Keaveney Dep. at 45). In addition, she stated that Defendant factored in geography when choosing who to promote to these regional KAM leadership positions, and therefore, did not consider any internal candidates in the Midwest, such as Ference, for either the Southeast or Northeast regional positions. (*Id.* at 91). Analyzing these reasons, we find that Ference's evidence that he was more qualified than Russell does not demonstrate that "no reasonable person" could have selected Russell over Ference for this position. *Fischer*, 519 F.3d at 404.

Finally, Ference claims he was more qualified than Childress for the Northeast Regional KAM Leader position because of his superior management experience, sales experience, and people management experience. (Pl. Facts ¶ 117). To support his superior qualifications, Ference offers testimony from Anthony that Ference was "more qualified than Kathleen" and

that she "had not managed people." (Anthony Dep. at 36). In addition, Walker testified that he was "shocked" when he learned that Childress had been promoted because he "didn't think she had the experience for that job." (Walker Dep. at 53).

These reasons, however, are not enough to overcome Ference's burden of proving that Defendant's nondiscriminatory reasons for hiring Childress are lies. As indicated above, Defendant's reasons include geography and Keaveney's impression of Ference's leadership and client experience. In addition, Defendant indicates that it chose Childress for this positions because of her "[v]ery, very strong reputation throughout Aon Consulting of being a client team leader, of bringing creative teams together and delivering exceptional service to clients." (Keaveney Dep. at 44; *see also id.* at 42). While Ference has provided testimony from Anthony and Walker indicating their belief that Childress was not as qualified as Ference, neither of them were the decision makers, and thus their impressions of Childress's qualifications are irrelevant in determining whether Keaveney and the other decision makers honestly believed the reasons they have proffered. *See Hartley,* 124 F.3d at 890 ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless.").

## 2. Chicago Market Leader Position

Defendant described the qualifications for the Chicago Market Leader as "someone who is well respected by peers, had personal success in the marketplace, and could lead others in pursuits and gain traction in the marketplaces, as well as helping to develop a strong culture in the office." (Hayley Dep. at 63-64). Ference claims that he was more qualified than Martens to be the Chicago Market Leader and that the reasons Defendant offers for selecting Martens are

pretextual.

As evidence, Ference argues that, contrary to Defendant's claims, he was "well-respected by his peers and had a experience managing a book of business in excess of one million dollars and managing and cultivating successful accounts and developing high profile clients." (Resp. at 10-11). In addition, he had very similar responsibilities when he was the Central Sales Leader. (*Id.* at 11). In fact, Ference argues that he was over-qualified for the position as evidenced by the fact that Martens used to report to him (Pl. Facts ¶ 100), and Anthony's testimony that Ference was better than Martens "on his worst day." (Anthony Dep. at 44). Defendant, however, claims to have selected Martens because "he is well respected by his peers, had personal success in the marketplace, had a proven record to lead others in the marketplace and could help develop a strong culture." (Mot. at 13).

While Ference has offered testimony from Anthony and Walker to show that he was more qualified than Martens, such testimony is irrelevant to show that the promotion choice was based on discriminatory reasons because neither Anthony nor Walker was the decision-maker, and it is the "perception of the decision-maker" that controls the pretext analysis. *See Karazanos*, 948 F.2d at 337-38(quoting *Weihaupt,* 874 F.2d at 428). Thus, Ference has not demonstrated that no reasonable person would have promoted Martens instead of Ference.

### 3. Head of Insurance Practice Vertical

Lastly, Ference argues that the fact that he was more qualified than Craig-Burke to be the Head of the Insurance Practice Vertical is evidence of Defendant's pretext. Defendant claims that it selected Craig-Burke "due to her extensive experience in healthcare and the insurance industry." (Def. Facts ¶ 45; Keaveney Dep. at 96). Ference claims that he was more qualified

than Craig-Burke because "he was the original person to develop the business plan for the insurance industry vertical which he offered to lead" in 2001. (Resp. at 12; Pl. Dep. at 83-86). Given Craig-Burke's experience, however, the fact that Ference's development of an insurance business plan at least 4 years prior to Craig-Burke's promotion is not enough to overcome his burden of showing that the differences between himself and Craig-Burke "are so favorable to [him] that there can be no dispute among reasonable persons of impartial judgment that [he] was clearly better qualified for the position.'" *Fischer*, 519 F.3d at 404. Thus, Ference has not demonstrated that Defendant's reasons for not promoting him are lies and that the actual reason was based on gender discrimination.

### 4. Other Alleged Discriminatory Evidence Regarding Promotions

Even if a plaintiff cannot establish that he is more qualified in a failure to promote case, he may use other evidence to try to establish pretext. *Fischer*, 519 F.3d at 404 (finding that district court erred when it held that a plaintiff "must" establish that she was more qualified in a failure to promote case without examining other evidence of pretext). Ference claims that in addition to his superior qualifications, he has evidence that Defendant's reasons for failing to promote him are pretextual. This evidence includes Defendant's failure to abide by internal hiring policies, evidence of a general age-based bias that affected Defendant's decision making, and evidence that Defendant purposely made promotions unattainable for Ference by cutting his budget, setting unrealistic goals, and transferring his accounts.

### a. Departures from Aon Policy

Ference claims that in addition to his superior qualifications, Defendant's failure to abide by internal hiring policies by failing to post open positions and examine internal candidates first

are evidence of pretext. While "departures from established practices may evince discriminatory intent," *Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996), "[a] plaintiff cannot be permitted to manufacture a case merely by showing that the employer does not follow its employment rules with Prussian rigidity." *Walker v. Abbott Labs.*, 416 F.3d 641, 644 (7th Cir. 2005); *see also Woods v. Ill. Dep't of Corr.*, 167 Fed. Appx. 553, 555 (7th Cir. 2006) (noting that evidence that an employer promoted someone who did not fit the posted standards of a job listing was not sufficient to demonstrate pretext); *Balamut v. Abraham*, Nos. 97 C 4174 & 97 C 4314, 2004 U.S. Dist. LEXIS 21351, at *14, 17 (N.D. Ill. Oct. 20, 2004) (finding that employer's failure to follow normal hiring practices was not enough to establish evidence of pretext because it affected all employees equally and the undisputed evidence demonstrated that person in charge of hiring chose the "best qualified for the position").

To establish Aon's policy of posting open positions, Ference relies on a document entitled "Frequently Asked Questions." (Pl. Facts Ex. L).[14] This document states that "Aon's corporate policy is that every open Aon position in the U.S. must be posted on Aon Advance for a minimum of seven days." (*Id.*). In addition to posting requirements, the company has general

---

[14] Defendant argues that this evidence is inadmissible because it is attached as an exhibit to Ingram's deposition, however, Ingram did not recognize it when asked. (Ingram Dep. at 34). While we acknowledge that Ference may not have laid a foundation for this document, for purposes of summary judgment, we may review this document as potential evidence because there is no indication that the other evidence that Ference submitted is somehow suspect. *See Parnell v. Hometown Distrib. Co., Inc.*, No. 04 C 3739, 2006 WL 314518, at *1 n.1 (N.D. Ill. Feb. 7, 2006) (refusing to find documents inadmissible on grounds that they lack foundation "absent some specific indication that the authenticity of other documents submitted by [the nonmovant] are suspect"); *Scott v. Pace Suburban Bus*, No. 01 C 1039, 2003 WL 1579166, at *5 n.3 (N.D. Ill. Mar. 23, 2003) (declining to find documents inadmissible on summary judgment "absent some reasonable indication that the authenticity of other documents submitted by Scott are suspect").

policy of looking to internal candidates to fill open positions. (*Id.*; Pl. Facts ¶ 90).

Even examining this evidence in a light most favorable to Ference, however, we do not find that failing to post the open positions demonstrates that the reasons that Defendant has given for promoting Yehle, Russell, Childress, Martens, and Craig-Burke are lies "contrived to mask unlawful discrimination." *Little*, 369 F.3d at 1012. This is because even if there was an internal policy to post open positions as Ference claims, there is no evidence that posting open positions at Aon Consulting was an "established" practice. *See Nabozny*, 92 F.3d at 455 ("[D]epartures from *established* practices may evince discriminatory intent." (emphasis added)). There is also no evidence that employees at Defendant were aware of this policy. In fact, Ingram, Defendant's CEO, not only indicated that he did not recognize the document listing Aon's policies, but also that he was unaware of an official policy that required all jobs to be posted. (Ingram Dep. at 34; *see also* Walker Dep. at 80 ("I think Human Resources has a policy. I don't think I have even seen a position posted, but maybe I'm not looking on the website.")).

According to Ingram, only "midlevel jobs down" require postings, which includes positions that involve more transferable, and not specialized, skills, such as accounting, human resources, and staff-related positions. (*Id.* at 35-36). On the other hand, Ingram described "senior level positions" as "generally vice president levels and up," which includes all of the positions at issue since Ference began his tenure at Aon as a senior vice president. (*Id.* at 37; Pl. Dep. at 17).

Even assuming Defendant has a policy of posting open positions, there is no evidence that deviations from this policy were based on a discriminatory reason. *See Obi v. Anne Arundel County, Md.*, 28 Fed. Appx. 333, 336 (4th Cir. 2002) (holding that even though an employer

24

violated company policy by selecting an external candidate over an internal candidate, the plaintiff could not establish pretext because he did not "present evidence the policy was implemented differently based on a prohibited classification"). None of the eight alleged discriminatory promotions were posted and, in fact, there is no evidence that any senior level positions were posted. (*See* Pl. Dep. at 249-50). Thus, if the decision makers were unaware of this policy, their failure to abide by it does not support an inference that the reasons they gave for their hiring decisions were intended to mask a discriminatory motivation.[15]

In contrast, Ference has demonstrated that there was an established practice of looking to internal candidates to fill senior level positions. (Ingram Dep. at 80). However, the only promotion that involved an external candidate was Yehle's promotion to Central West Regional KAM Leader. With respect to this promotion, the evidence shows that Defendant actually followed its policy and considered internal candidates, such as all of the KAMs, including Ference, for KAM leadership positions. (*See* Keaveney Dep. at 31-32). However, after giving Ference consideration, Defendant decided that he lacked the strong leadership skills and client development necessary for the role. (*See id.*). Because this policy does not state that an internal candidate must be hired for an open position, only considered, Defendant actually abided by this policy and therefore, this is insufficient evidence of pretext. (*See* Pl. Facts Ex. L).

### b.  General Age-Based Bias in Decision Making Process

---

[15]  Also, we are unconvinced that the decisions were discriminatory based upon age because Keaveney hired individuals within Ference's protected age group. For example, Childress was hired as a Regional KAM leader despite being only seven years younger than Ference. (Neiderkorn Decl. ¶ 5); *see also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 n.1 (7th Cir. 1997) ("In this circuit, 'substantially younger' means at least a ten-year age difference; any age disparity less than ten years is 'presumptively insubstantial.'" (quoting *Hartley v. Wis. Bell Inc.*, 124 F.3d 887, 893 (7th Cir. 1997))).

Ference claims that evidence of a general age-based bias at Aon supports the finding that Defendant's reasons for failing to promote him were pretextual. Ference's evidence includes: (1) two comments that Ference interpreted as age-based threats; (2) the fact that Walker, a sixty-four year old, was not promoted to KAM Regional Leader; (3) Anthony's comment that prior to and after his departure from Aon, "all of a sudden [people who were 55 or older] started to disappear" (Anthony Dep. at 51); and (4) the decision to move Ference from an office to a cubicle.[16] (Resp. at 12-13).

We addressed the first of these reasons above and find it inadequate to support a finding of pretext.[17] With respect to the second reason, Ference argues that the failure to promote another older employee, Walker, is additional evidence of pretext. (Pl. Facts ¶ 98). Walker asked Keaveney if he could interview for this position, but was refused because Defendant wanted him to be "client focused," instead of in management, because "they did not have many people with the skills that [he] had in that position." (Walker Dep. at 51). Walker indicated that he believed that this reason was "incomplete, but valid" because he believed he was more qualified than Yehle. (*Id.* at 52). Given both that Walker believed that wanting him to remain

_____

[16] We also note that to the extent that Ference may be claiming that the movement from an office to a cubicle makes out a separate disparate treatment claim under the ADEA, such a claim would fail because it is insufficient to constitute a "materially adverse action." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1119 (7th Cir. 2001) (finding that assignment to less desirable work space did not amount to an adverse employment action because there was no evidence that his new work area involved lower pay or different hours); *see also Jackson v. Int'l Bros. of Teamsters, Local Union 7-05, AFL-CIO*, No. 02 C 2745, 2004 WL 1718635, at *7-8 (N.D. Ill. July 30, 2004).

[17] In addition, both of the alleged discriminatory comments are too tenuously related to any non-time-barred promotion decision to constitute evidence of pretext. *See Schuster v. Lucent Techs.*, 327 F.3d 569, 576 (7th Cir. 2003) (holding that comments not proximately related to any employment decision are "stray" and insufficient to support a finding of pretext).

more client-focused was a valid reason and the fact that his own self-serving statements about his qualifications are irrelevant, there is no evidence that the decision not interview him was somehow discriminatory. *Dunn*, 260 F.3d at 787 (holding that one's self-appraisal regarding one's own qualifications does not create an issue of fact). Accordingly, the failure to interview Walker is insufficient demonstrate that the decision not to promote Ference was somehow discriminatory.

As to the third piece of evidence, we do not find that Anthony's comment is sufficient to raise an inference that Defendant's promotion decisions were based on age discrimination. He was not involved in the decisions to promote/hire Yehle, Russell, or Martens, and therefore his beliefs regarding any age-related inequities in the office do not demonstrate that the real reasons for these decisions were age-related. *See Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998) (finding that statements by those uninvolved in the decision making process that indicate that age may have factored into the decision making process are mere speculation and do not constitute evidence of discrimination). Instead, he merely offers a general observation regarding what was occurring in the office—older people were leaving through "retirement windows" during this time frame. The fact that older people were suddenly retiring is not enough to show that they were doing so due to discriminatory reasons.

Likewise, the fourth piece of evidence that Ference has offered of age-based bias is not enough to demonstrate that Defendant's proffered reasons are merely pretextual. Ference argues that the fact that he was moved from his office to a cubicle after working at Aon for seventeen years, while younger male employees were given offices, demonstrates an age-based bias. (Resp. at 13; Pl. Facts ¶ 114). Ference claims that this bias is particularly evident because while

Defendant claims that Martens was given an office because he dealt with confidential information, Walker, another older male employee, also dealt with confidential information but was denied an office. (Resp. at 13).

Defendant, however, offers a different explanation for Ference's move to a cubicle. Keaveney testified that her and Yehle decided to remove Ference from his office after being allocated a reduced number of offices. (Keaveney Dep. at 74). They determined that Ference should move to a cubicle and that Martens should receive an office because Ference "worked quite a bit from his home in Indiana" and Martens had to handle confidential discussions with employees as the Chicago Market Leader. (*Id.* at 73-74). Defendant also distinguishes the type of confidential information that Walker dealt with as client-related, whereas Martens dealt with business and employee information. (Def. Resp. to Pl. Facts ¶ 114). In addition, no other KAMs in the Central West Region had offices. (Def. Facts Ex. 18).

While there is some evidence that another employee who rarely came into the office was given an office, there is no evidence that reallocating offices based upon the type of confidential information that Martens dealt with and his position was somehow discriminatory. (Walker Dep. at 65). In fact, Walker testified that he did not believe the way the offices were assigned was discriminatory. (*Id.* at 66). Given that all the Central West KAMs had cubicles, not offices, we do not find that the transfer of Ference to a cubicle constitutes evidence of pretext.

**III. Disparate Treatment**

In addition to his failure to promote claims, Ference alleges disparate treatment under the ADEA. He claims that Defendant treated younger colleagues more favorably with respect to KAM goals in the way that it assigned accounts, set performance metrics, and disciplined employees. (Resp. at 5). As examples of this Ference includes: (1) In 2002, Ingram asked him to cut his budget in half and terminate his staff to reduce expenses which prevented him from being promoted to executive vice president; (2) he was assigned difficult clients; (3) his accounts were transferred once they were "ready to blossom;" (4) he was given unrealistic performance metrics; (5) Yehle and Martens were not disciplined for failing to meet their 2006 chargeable hours goals.

To establish a *prima facie* case for disparate treatment under the ADEA, a plaintiff must show: "(1) []he belongs to a protected class; (2) []he performed [his] job according to his [employer's] legitimate expectations; (3) []he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the [employer]." *Atanus*, No. 07-1430, 2008 WL 696908, at *6. While we acknowledge that the parties dispute whether Ference has demonstrated the second and fourth prongs of his *prima face* case, even assuming that he has, we find that he has failed to prove that Defendant's proffered reasons for setting its goals are pretextual.[18]

After reviewing the record, we find that Ference has not shown that Defendant's true motivation for these decisions was based upon age discrimination. First, there is no evidence

---

[18] In addition, Ference appears to be arguing that these facts also serve as evidence of pretext for his failure to promote claims because they demonstrate that Defendant took actions to mischaracterize Ference's performance to ensure that he would not qualify for promotions. (Resp. at 13-14). As indicated below, we find no evidence of pretext in these decisions.

that Ingram's request that Ference cut his budget and staff in half was somehow discriminatory based upon Ference's age.[19]  With respect to the types of accounts that were assigned to and/or transferred from Ference, even examining these facts in a light most favorable to the Ference, there is no indication that these decisions were motivated by anything other than age-neutral reasons.[20]

We also find no evidence that Ference's performance metrics were set for discriminatory reasons.  Ference  claims that because he was not a member of a practice group his 25% chargeable hours goal in 2006 was unrealistic.  However, Ference's chargeable hours goal was less than his team members.  (Keaveney Dep. at 52-53).  In addition, even if we assume that

---

[19]  While Ference claims that he believed the effect of this was to prevent him from becoming an Executive Vice President, the only evidence regarding the reasons for this change concerns expenses.  (*See* Ingram Dep. at 75-76; Pl. Dep. at 244).

[20]  Ference claims that he was assigned clients that "lacked sales opportunities, were challenges, were not revenue producing or were of declining revenue."  (Pl. Facts ¶ 103).  For example, Ference was assigned the Sears account while Aon was involved in litigation with Sears and McDonald's after Vaughn had fractured the company's relationship with the client.  (*Id.* ¶¶ 103, 104).  Furthermore, Ference claims that clients, such as McDonald's, were transferred from him to Martens, right after his 2.5 years of effort created an opportunity for the account to "blossom."  (*Id.* ¶ 105).

The record shows, however, that accounts were assigned based on geography and relationships with client contacts.  (Def. Facts ¶ 63; Keaveney Dep. at 46 (describing methodology for assigning accounts)).  In addition, part of a KAM's responsibilities appears to be to deal with "problems that arise in business relationships at Aon Consulting that they had no involvement whatsoever in causing."  (Yehle Dep. at 89).  While Ference claims that some other KAMs were assigned accounts with more goodwill (e.g., Yehle was assigned to the Accenture account), this is not enough to show that the assignment process was somehow based upon Ference's age.

With respect to the transferring of his accounts, Ference has not provided evidence sufficient to dispute that the reason for transferring the McDonald's account was due to with the client's dissatisfaction with his work and the fact that the client wished to work with Martens.  (*See* Hayley Dep at 75; Yehle Dep at 49).  In addition, Ference's claims that the decisions to transfer the Verizon and Discover accounts to younger males was somehow motivated by discriminatory reasons are merely speculative.  (Pl. Dep. at 76).

other KAMs were permitted to join practice groups, the evidence indicates that Ken Weinberger, one of the KAMs that Ference alleges was able to join a practice group, is older than Ference. (Def. Facts Ex. 16). Thus, we are unpersuaded that his chargeable hours goal was set to prevent him from obtaining promotions due to his age.[21]

Finally, we do not find evidence of discrimination in the disciplinary measures taken for those who failed to meet there chargeable hours goals. Ference argues that Defendant's failure to discipline Yehle and Martens for not meeting their hours goals is evidence of age discrimination. (*See* Resp. at 5). However, the evidence shows that both Martens's and Yehle's performance evaluations reflected their inability to meet their hours goals and that they performed better on other metrics. (Yehle Dep. at 64-65; Martens Dep. at 35-36). Therefore, Defendant's reason for not disciplining them in a similar manner to Ference appears to be legitimate.[22]

---

[21] In addition, there is no evidence that other performance metrics, such as sales credit and innovation goals, were applied in a discriminatory manner.

[22] To the extent that Ference argues that all of the above facts combined demonstrate pretext for Defendant's promotion decisions, we are unpersuaded. *See Gorence*, 242 F.3d at 763 ("And it is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

# CONCLUSION[23]

For the above reasons, we grant Defendant's Motion for Summary Judgment.  It is so ordered.

MARVIN E. ASPEN
United States District Judge

Date: May 19, 2008

---

[23]  Ference asserts a constructive discharge claim for the first time in his response to Defendant's motion.  Because the summary judgment stage "is too late in the day to be adding new claims," we will not address that claim here.  *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997); *see also Children's Mem. Hosp. v. Corr. Med. Servs., Inc.*, No. 02 C 8228, 2003 WL 120321, at *3 (N.D. Ill. Jan. 10, 2003).